| | |
|---|---|
| **ANNIE SLOAN INTERIORS, LTD.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 17-11767** |
| **JOLIE DESIGN & DECOR, INC.** | **SECTION: "S" (1)** |

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that Annie Sloan Interiors, Ltd.'s Motion for Partial Summary Judgment (Doc. #9) is **GRANTED**.

**IT IS FURTHER ORDERED** that Annie Sloan Interiors, Ltd.'s Rule 12(b) Motion for Partial Dismissal of Jolie Design & Decor, Inc.'s Counterclaim (Doc. #14) is **GRANTED**, as to a portion of Jolie Design & Decor, Inc.'s second counterclaim, and it is **DISMISSED**. The motion is otherwise **DENIED**.

### BACKGROUND

This matter is before the court on a motion for partial summary judgment and a motion to dismiss counterclaims filed by plaintiff and defendant-in-counterclaim, Annie Sloan Interiors, Inc. ("ASI").

ASI, which was founded by Annie Sloan, is a foreign company organized under the laws of the United Kingdom that maintains its principal place of business in Oxford, England. ASI designs and manufactures paints and associated products under the trademarks ANNIE SLOAN® and CHALK PAINT®.

In 2009, Lisa Rickert, a Louisiana resident, ordered CHALK PAINT® online from ASI's e-commerce platform for her personal use. Rickert liked the product and contacted ASI to find out if there were any distributors in the United States that could provide her with the product more

quickly and cheaply. ASI informed Rickert that it was in the process of searching for a distributor in the United States to develop the market for CHALK PAINT®.

Rickert had experience in supply chain management and her husband, David Manuel, had experience in warehouse operations management. Rickert and Manuel participated in a teleconference with Sloan to discuss the business opportunity of their becoming the United States distributor of CHALK PAINT®, as well as working with Davis Paint, a paint manufacturer in the United States.

After the call, Rickert and Manuel formed defendant and plaintiff-in-counterclaim, Jolie Design & Decor, Inc. ("JDD"), as the entity to serve as ASI's distributor in the United States. JDD is organized under the laws of and maintains its principal place of business in Louisiana.

Rickert, on behalf of JDD, drafted and proposed two agreements for discussions among the parties regarding their business relationship: (1) a manufacturing agreement between ASI, JDD and Davis Paint, granting Davis Paint the exclusive right to manufacture CHALK PAINT® in the United States; and (2) an agreement between JDD and ASI for JDD to be ASI's exclusive distributor of CHALK PAINT® in the United States. After discussions and revisions, the parties executed both agreements. JDD and ASI signed the distribution agreement on April 19, 2010 (the "2010 Agreement").

Pursuant to the 2010 Agreement, JDD became ASI's exclusive distributor in the United States. The operative contractual language in this regard states:

> Supplier [ASI] hereby appoints Distributor [JDD] as Supplier's [ASI's] exclusive distributor of Products in the Territory, and Distributor accepts that position on a perpetual basis.

The 2010 Agreement defines "Territory" as the "United States of America." As ASI's distributor, JDD was required by the 2010 Agreement to "use its best efforts to distribute the Products and to fully develop the market for the Products within the Territory." ASI and JDD agreed that with JDD using its "best efforts" the "Annual Market Potential" for the first year was that JDD would purchase and distribute 4,800 quarts of paint in the territory. The parties agreed annually to consult with each other to agree on the Annual Market Potential for that year. ASI retained the right to renegotiate the terms of the 2010 Agreement if JDD did not reach 50% of the agreed upon Annual Market Potential in any given year. Under the 2010 Agreement, the parties also stipulated that "[a]ll Products purchased by [JDD] shall be purchased solely for commercial resale, excepting those Products reasonably required by [JDD] for advertising and demonstration purposes."

Working under the 2010 Agreement, JDD successfully built a distribution network for ASI's products in the United States. JDD claims that as a result, ASI asked JDD to expand its territory to cover all of North America, Central America, South America and Australasia, and JDD expended resources to do so.

ASI and JDD agree that their relationship eventually deteriorated. ASI claims that it was concerned with certain actions on the part of JDD that ASI deemed detrimental to its brand, such as JDD's expanding its territory to areas not covered by the 2010 Agreement, JDD's failure to abide by "brand guidelines," and JDD's lack of uniformity in its wholesale pricing structure. JDD claims that in 2013 and 2014, "ASI attempted to insert itself into JDD's distribution and operational practices" in many ways such as: demanding that JDD use ASI generated marketing, promotions and advertisements; prohibiting JDD from using its own new marketing initiatives as "off-brand"; requiring JDD to adopt the name "Annie Sloan Unfolded"; limiting JDD's ability to expand into new

markets within South and Central America; making decisions on which stockists JDD could bring on or let go; dictating JDD's wholesale pricing; prohibiting stockists from sharing paint color recipes; mandating how ANNIE SLOAN® products had to be displayed at the stockists' retail locations; restricting the stockists ability to conduct workshops; and, demanding approval over JDD's routine business matters.

In 2015, ASI informed JDD that it no longer considered the 2010 Agreement to be "sufficient" to accomplish ASI's business objectives and that it would be releasing "brand guidelines" that JDD and other distributors were expected to follow. JDD requested that ASI attend a mediation administered by the International Dispute Resolution Center to attempt to resolve their differences. ASI refused to participate, and told JDD that it would seek a declaratory judgment on the validity of the 2010 Agreement. ASI did not file suit and requested that JDD participate in a video conference presentation of the revised set of "brand guidelines." JDD participated in the call in January 2016.

Thereafter, ASI requested that JDD prepare a document associating each of the "brand guidelines" to a provision of the 2010 Agreement. JDD complied, producing a document that indicated whether the "brand guideline" changed the parties' rights and responsibilities under the 2010 Agreement, if so, whether JDD would be amenable to adopting it, and the commitments JDD would need in return for amending the 2010 Agreement to conform to the "brand guidelines." JDD presented the document to ASI for consideration. ASI responded that the "brand guidelines" were non-negotiable and refused to mediate.

Eventually, the parties began to communicate, and ASI requested that JDD meet with ASI in Oxford, England. The meeting occurred in April 2017. In September 2017, JDD informed ASI

that it intended to begin selling ASI products on Amazon.com. ASI requested that JDD develop a plan to ensure that online sales would benefit the traditional brick-and-mortar stockists of ASI's products. JDD complied. ASI requested that JDD delay its Amazon.com launch so that ASI could meet with representatives of Amazon Europe. JDD waited a few weeks and when it did not receive an update from ASI regarding its talks with Amazon Europe, JDD began selling on Amazon.com on October 4, 2017. ASI claims that JDD's selling ASI's products on Amazon.com is a violation of the 2010 Agreement because the contract restricts JDD to "commercial resale," and does not permit sales directly to consumers.

On November 3, 2017, ASI filed this action against JDD alleging diversity subject matter jurisdiction under 28 U.S.C. § 1332, and seeking a declaratory judgment finding that: (1) the 2010 Agreement's perpetual term is against Louisiana public policy and is terminable at the will of either party upon a reasonable notice pursuant to Louisiana Civil Code article 2024; (2) 180 days constitutes reasonable notice for terminating the 2010 Agreement; (3) JDD's activities in countries other than the United States are not encompassed by the 2010 Agreement and JDD does not have rights to the exclusive distributorship of ASI's products in those countries; and, (4) to the extent that JDD's activities in countries other than the United States are conducted under the 2010 Agreement, the termination of the 2010 Agreement would result in the termination of JDD's exclusive distributorship in those countries.

JDD filed an Answer and Counterclaim. In its Counterclaim, JDD seeks a declaratory judgment finding that: (1) the 2010 Agreement is legally enforceable, including its provisions regarding its duration and the grounds for resolution or termination; (2) JDD is in full compliance with its obligations under the 2010 Agreement and has not breached it by any action or inaction, and

that the 2010 Agreement is in full force and effect; (3) the 2010 Agreement permits JDD to sell ASI's products directly to consumers, including over the Internet; (4) to the extent JDD has not implemented some or all of ASI's "brand guidelines" in territories where JDD sells ASI's products, such action does not constitute a breach of JDD's obligations under the 2010 Agreement or a justification for ASI to resolve or terminate it; (5) JDD has the right under the 2010 Agreement to market, advertise, promote, distribute and sell ASI's products using whatever methods and means JDD, in its reasonable discretion, deems appropriate; (6) JDD has exclusive distribution rights for ASI's products in North America, the United States, Canada, Central America, South America, Australia, New Zealand, and other parts of Australasia; (7) the 2010 Agreement applies to control the relationship between ASI and JDD in all of those geographical areas where JDD is the exclusive distributor of ASI's products; (8) JDD has the sole right to select and terminate stockists in its reasonable discretion in those geographical areas where JDD is the exclusive distributor of ASI's products; and, (9) in the alterative, if the court declares that ASI is entitled to terminate the 2010 Agreement at will with reasonable notice, that reasonable notice under the circumstances would consist of a substantial period of time, the precise duration of which to be established by evidence at trial.

On December 19, 2017, ASI filed the instant motion for partial summary judgment seeking a declaration that the 2010 Agreement's perpetual term is against Louisiana public policy and is terminable at the will of either party upon a reasonable notice pursuant to Louisiana Civil Code article 2024. On January 2, 2018, ASI filed the instant motion to dismiss JDD's counterclaims arguing that JDD's request for declaration that the 2010 Agreement is in full force and effect does not present a justiciable controversy because both parties agree that the 2010 Agreement remains

in force. ASI also argues that JDD's counterclaims numbers 2 and 4 through 8 should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because they do not state claims for which relief can be granted.

## ANALYSIS

### I.  ASI's Motion for Partial Summary Judgment (Doc. #9)

ASI seeks partial summary judgment on the narrow legal question of whether Louisiana Civil Code article 2024 applies to the 2010 Agreement.

#### A.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2509-10 (1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 106 S.Ct. at 2510).

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the

summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents properly to support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### B. Contract Interpretation Under Louisiana Law

In Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 112 So.3d 187, 192 (La. 3/19/13) (citations and quotations omitted), the Supreme Court of Louisiana explained the law applicable to contract interpretation:

> Contracts have the effect of law for the parties and the interpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted

in light of the other provisions so that each is given the meaning suggested by the contract as a whole.[1]

The clause of the 2010 Agreement at issue in ASI's motion for partial summary judgment states:

> Supplier [ASI] hereby appoints Distributor [JDD] as Supplier's [ASI's] exclusive distributor of Products in the Territory, and Distributor accepts that position *on a perpetual basis.*

The parties disagree as to the meaning and effect of this clause. ASI argues that this clause stating that the 2010 Agreement will continue on a "perpetual basis" means that the contract is of an unspecified duration that is neither ceratin, fixed, nor determinable, rendering it subject to Article 2024 and terminable at the will of either party upon reasonable notice. On the other hand, JDD argues that the contract has a specified term of a determined duration, which is perpetual or forever. JDD argues that because the contract specifies that it will go on perpetually, it has a stated certain term of duration and Article 2024 is inapplicable.

Article 2024 states: "[a] contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." La. Civ. Code art. 2024. This Article was added to the Louisiana Civil Code in 1984. Id. It did "not change the law", but rather made "generally applicable the principle contained in" Article 2686 of the Louisiana Civil Code of 1870.[2] La. Civ. Code art. 2024, Comment (a).

---

[1] It is undisputed that Louisiana law applies to the interpretation of the contract at issue.

[2] Article 2686 of the Louisiana Civil Code of 1870 applied to leases and stated:

> The parties must abide by the agreement as fixed at the time of the lease. If no time for its duration has been agreed on, the party desiring to end it must give notice in writing to the other, at least fifteen days before the expiration of the month, which has begun to run.

9

Louisiana intermediate courts of appeal have explained that, pursuant to Louisiana Civil Code article 13[3], Article 2024 must be read *in pari materiai* with Louisiana Civil Code article 1778, which states:

> A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.

Schultz v. Hill, 840 So.2d 641, 644-45 (La. Ct. App.), *writ denied*, 852 So. 2d 1043 (La. 2003) (quoting La. Civ. Code art. 1778); see also Caddo Gas Gathering L.L.C. v. Regency Intrastate Gas LLC, 26 So.3d 233, 236 (La. Ct. App. 2009).  Under Article 1778, "'a term may be fixed not only by a period of time allowed for the performance of an obligation but also by an event which is certain, such as a person's death.'" Id. at 645 (quoting La. Civ. Code art. 1778, Comment (b)).

Reading Articles 2024 and 1778 together, the court in Schultz explained:

> In essence, LSA–C.C. art. 1778 describes three different types of scenarios concerning the term of a contract: (1) a certain or fixed term; (2) an uncertain but determinable term; or (3) an uncertain and undeterminable term. Taking the comments and text of Article 1778 together, one concludes that an uncertain term that is determinable by reference to the happening of a future event is valid and enforceable, even though the date of the happening of that future event cannot be known until its occurrence.
>
> We reconcile Article 2024 and 1778 by concluding that Article 2024 can only be applied to contracts of "unspecified duration;" i.e., contracts having an uncertain and undeterminable term.

Id.

---

[3] Article 13 states: "[l]aws on the same subject matter must be interpreted in reference to each other." La. Civ. Code art. 13.

After reciting these principles, the court in <u>Shultz</u> held that Article 2024 did not apply to the contract at issue. <u>Id.</u> The real estate commission agreement stated that the landlord would pay commissions to the real estate agent "during the initial term, options, renewals, extensions, assignments or additional leases with the Tenant[s]" that the real estate agent found for the landlord's properties. <u>Id.</u> at 644-45. The court held that the contract contained an uncertain but determinable term that was fixed by the happening of a future event, *i.e.* the termination of the applicable leases. <u>Id.</u> at 645. Thus, Article 2024 did not apply. <u>Id.</u>

To reach this conclusion, the <u>Shultz</u> court analyzed <u>State *ex rel.* Guste v. Orkin Exterminating Co.</u>, 528 So.2d 198 (La. Ct. App.), *writ denied*, 533 So.2d 18 (La. 1988), which involved a contract for pest control and repair services that were guaranteed for the lifetime of the treated structures as long as the customers paid a specific annual renewal fee. <u>Id.</u> The contracts did not provide for a general increase in the annual renewal fees, and legal action was taken when Orkin began to raise them. <u>Guste</u>, 528 So.2d at 199-200. Orkin argued that the contracts were for an uncertain and undeterminable term and thus could be cancelled with reasonable notice. <u>Id.</u> at 201. The court found that "[a] contract for the lifetime of the structure is for a definite and ascertainable period." <u>Id.</u> The court explained that "[c]ontractual obligations dependent upon an ascertainable fact or event is sufficient to render the duration of the contract definite and certain. Contracts may be uncertain as to point of time when they will terminate, so long as there is no uncertainty as to the event which will bring about their termination." <u>Id.</u> (citations omitted).

In <u>Caddo Gas</u>, 26 So.3d at 235-36, the court followed the analysis of the <u>Shultz</u> case regarding the application of Article 2024. <u>Caddo Gas</u> involved a contract whereby defendant, Regency Intrastate Gas LLC, agreed to transport through its pipeline natural gas for plaintiff, Caddo

Gas Gathering L.L.C. Id. at 234. The contract at issue stated that it "shall remain in force and effect . . . for a term coextensive with the ownership or use of [the pipeline] by [Regency]." Id. Regency argued that the contract was "of unspecified duration and that it may be terminated by either party upon reasonable notice as provided by" Article 2024. Id. at 235. Applying the reasoning of Shultz regarding the interpretation of Article 2024 and examining Shultz and Guste, the court held that Article 2024 was inapplicable because the contract had an uncertain but determinable term by reference to the happening of a future event, *i.e.* Regency's ownership or use of the pipeline. Id. at 236-39.

Following these principles, the court determines that Article 2024 is applicable. The 2010 Agreement states that JDD accepts the appointment as ASI's distributor of certain products in the Territory "*on a perpetual basis.*" The 2010 Agreement "specifies" that its term is "perpetual." However, using a specific word to define the term does not automatically mean that the contract has a specific duration. To the contrary, a contract that continues on "a perpetual basis" will presumably go on forever. The "perpetual" term of the 2010 Agreement is for an "unspecified duration" that is also undeterminable. There is nothing in the contract that references a specific future event the happening of which will terminate the contract like there was in Shultz (when the leases terminated), Caddo Gas (when Regency no longer used or owned the pipeline), or Guste (for the life of the structures).

In Williams v. Classic Locksmith, L.L.C., 405 Fed. Appx. 884, 885-86 (5th Cir. 2010), the United States Court of Appeals for the Fifth Circuit, citing Caddo Gas and Shultz, noted that "Louisiana case law also follows this pattern of determining duration with reference to a specific identifiable event[,]" and held that an entity's need for a product "cannot be described as a single

definable moment at which the contract would terminate." Although the 2010 Agreement would terminate when ASI stops selling its products in the Territory, this is not a single definable moment at which the contract would terminate and the contract does not reference any specific event that would bring about its termination. Therefore, the 2010 Agreement is of an uncertain and undeterminable term, which makes it a contract falling under the purview of Article 2024 and terminable "at the will of either party by giving notice, reasonable in time and form, to the other party."

This result is bolstered by the United States Court of Appeal for the Fifth Circuit's ruling in Trident Partners I Ltd. v. Blockbuster Entm't Inc., 83 F.3d 704 (1996), which applied Texas law that is analogous to Article 2024. "Under Texas law, when a contract 'contemplate[s] continuing performance or successive performances and . . . [is] indefinite in duration,' it may be terminated at the will of either party." Id. at 708 (quoting Clear Lake City Water Auth. v. Clear lake Util. Co., 549 S.W.2d 385, 390-91 (Tex. 1977)). Trident Partners involved a contract whereby Trident Partners was granted a license by Blockbuster to operate video rental stores in Oregon and Washington under Blockbuster's brand (the "License Agreement"). Id. at 706-07. The License Agreement allowed for termination upon "(1) defaults by either party that are not or cannot be cured within a specified number of days; (2) the death or incapacity of a natural person who is one of Trident's partners, if Blockbuster does not consent to the transfer of the deceased partner's interest; (3) the transfer or change of control of Trident's partnership without Blockbuter's prior approval; and (4) the insolvency of either party." Id. at 708. The court held that none of the aforementioned conditions were of "the kind of determinable events that transform a contract of indefinite duration into one of definite duration[,]" and explained that it

would not hold that a contract is definite in duration when it (1) expressly states that it will "continue indefinitely," *and* (2) is confined in time only by "termination provisions" which contain conditions that are likely never to transpire. If we were thus to hold, Trident could very well be forced by Blockbuster to stay in the video rental and sales business, and operate Superstores, in perpetuity. This is precisely the antithetical result that courts seek to avoid by holding indefinite duration contract to be terminable at will.

Id. at 709 (citations omitted). Moreover, the court noted that "'this circuit . . . does not favor perpetual contract' and 'presumes that [any such] contract is terminable at will.'" Id. at 708 (quoting Delta Serv. & Equip., Inc. v. Ryko Mfg. Co., 908 F.2d 7 (5th Cir. 1990) (applying Iowa law, which provides that contracts "are terminable at will upon reasonable notice unless a provision in the contract makes it a contract of definite duration," and holding that the contract did not contain such a provision.)). Thus, the United States Court of Appeals for the Fifth Circuit recognizes that under the laws of several states contracts of an indefinite duration are terminable at the will of either party.

The reasoning of Trident Partners applies to the case at bar. The 2010 Agreement expressly states that it will continue "on a perpetual basis", i.e. indefinitely, and it does not contain any terminating provisions. Thus, if this court were to hold that Article 2024 does not apply to the contract, either JDD or ASI could force the other to remain in the business of selling ASI's products in the Territory in perpetuity, "precisely the antithetical result that courts seek to avoid by holding indefinite duration contract to be terminable at will." Id. at 709. Further, applying Article 2024 to the 2010 Agreement comports with the United States Court of Appeals for the Fifth Circuit's unfavorable view of perpetual contracts and presumption that such contracts are terminable at will. Id. at 708.

### C.   Erie Guess

JDD argues that this court should not rely on any of the above cited jurisprudence from the Louisiana intermediate courts of appeal, and instead should find that those cases were wrongly decided because they did not consider the history of Article 2024, which indicates that it should be applied only to real estate and employment contracts, not general commercial contracts.

This court has diversity subject matter jurisdiction over this case and Louisiana law is undisputedly applicable.  A federal district court applying Louisiana law looks first to the final decisions of the Supreme Court of Louisiana to determine the law on the issue. Howe ex. rel Howe v. Scottsdale Ins. Co., 204 F.3d 624, 627 (5th Cir. 2000). If the Supreme Court of Louisiana has not ruled on the issue, then the court must make an "Erie guess" and "determine as best it can" what the Supreme Court of Louisiana would decide. Id. To do so, this court may look to the decisions of the Louisiana intermediate courts of appeal for guidance. Id. "Intermediate appellate courts of Louisiana are a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quotations and citations omitted). The federal court's role is to predict, not create or modify state law. Id. at 628. Thus, the precedent provided by the intermediate appellate courts of Louisiana cannot be disregarded when the party advocating a departure from those rulings does not offer anything to suggest why the Supreme Court of Louisiana would decide the case differently. Id.

JDD explains that it thinks the cases cited above were wrongly decided because the cases do not consider that the history of Article 2024 is grounded in law applicable to leases, and that other perpetual contracts are recognized in Louisiana, such as those for the eternal care of graves. However, JDD does not explain why the Supreme Court of Louisiana would decide Shultz, Caddo

Gas, or Guste differently in terms of how Louisiana courts are to determine whether a contract is for: (1) a certain or fixed term; (2) an uncertain but determinable term; or (3) an uncertain and undeterminable term, and then apply Article 2024 if it falls the third category. Indeed, the Supreme Court of Louisiana denied writs in Shultz and Guste. Although the denial of a writ does not have jurisprudential value, it demonstrates that the Supreme Court of Louisiana had the opportunity to address the question at hand but declined to do so. This court is bound to consider the jurisprudence of the Louisiana intermediate appellate courts when there is no precedent on point from the Supreme Court of Louisiana. Further, the comments to Article 2024 indicate that it made the principles of the former Article 2686 generally applicable to all contracts, not just ones related to leases or employment. Thus, this court will not accept JDD's invitation to find that the aforementioned Louisiana jurisprudence was wrongly decided.

### D. JDD's Affirmative Defenses

JDD argues that there are factual disputes pertinent to its affirmative defenses of equitable estoppel, detrimental reliance and waiver that preclude summary judgment. The question posed and resolved by ASI's motion for partial summary judgment is a narrow legal issue of whether the 2010 Agreement is subject to Article 2024 because it is for an uncertain and undeterminable term. JDD's affirmative defenses do not impact whether Article 2024 applies, but rather the manner in which ASI will proceed under Article 2024, if it chooses to do so. Article 2024 requires "[r]easonable advance notice" for cancellation of the contract "to avoid unwarranted injury to the interest of the other party" and "the parties must comply with the overriding duty of good faith" in employing Article 2024. La. Civ. Code art. 2024, Comment (e). JDD's defenses which rely on the amount of time, money and effort it has expended in perusing the 2010 Agreement pertain to the reasonable notice that ASI must

give to JDD to proceed under Article 2024, not whether Article 2024 applies. Therefore, ASI's affirmative defenses do not preclude this court from ruling on ASI's motion for summary judgment and finding that the 2010 Agreement is subject to Article 2024 because the contract is for an unspecified and undeterminable duration. ASI's motion for summary judgment is GRANTED.

## II.     ASI's Motion to Dismiss (Doc. #14)

### A.    Rule 12(b)(1) of the Federal Rules of Civil Procedure

ASI argues that part of JDD's second counterclaim should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction because it does not state a justiciable controversy.

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." Ramming v. United States, 281 F.3d 158, 161 (5th Cir.2001). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Id. In a 12(b)(1) motion, the party asserting jurisdiction bears the burden of proof that jurisdiction does in fact exists. Id.

Article III of the Constitution of the United States "limits federal courts' jurisdiction to 'cases' and 'controversies.'" Sample v. Morrison, 406 F.3d 310, 312 (5th Cir. 2005) (citing U .S. Const. art. III, § 2). Ripeness is an essential component of federal subject matter jurisdiction. Id. "A court should dismiss a case for lack of 'ripenesss' when the case is abstract or hypothetical." New Orleans Public Serv., Inc., v. Council of City of New Orleans, 833 F.2d 583, 587 (5th Cir. 1987) (citations omitted).

Moreover, the federal Declaratory Judgment Act states: "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "A federal court may not issue a declaratory judgment unless there exists an 'actual controversy'; i.e., there must be a substantial controversy of sufficient immediacy and reality between the parties having adverse legal interests." Middle S. Energy, Inc. v. City of New Orleans, 800 F.2d 488, 490 (5th Cir.1986). A controversy is justiciable only where "it can be presently litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." Rowan Cos. v. Grim, 876 F.2d 26, 28 (5th Cir. 1989) (quoting Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662, 665 (5th Cir. 1967)). It gives federal courts the competence to declare rights, but it does not impose a duty to do so. If there is jurisdiction, whether to grant a declaratory judgment is within the sound discretion of the trial court.

ASI argues that part of JDD's second counterclaim, which seeks a declaration that "the 2010 Agreement is in full force and effect" does not state a justiciable controversy because the parties concur that the 2010 Agreement is in full force and effect. JDD argues that there is a dispute as to the full force and effectiveness of the 2010 Agreement because ASI seeks a declaration that it is a contract with an unspecified duration that can be terminated by either party with reasonable notice under Article 2024.

This portion of JDD's second counterclaim does not present a justiciable controversy. The parties concur that the 2010 Agreement was at the time of filing, and is currently, "in full force and effect." Indeed, the parties continue to perform thereunder. ASI's seeking a declaration as to the

applicability of Article 2024 to the 2010 Agreement is not a controversy over whether the contract is in effect, but rather as to whether ASI can terminate it with reasonable notice to JDD. It is a dispute about the meaning of a contractual term, not the effectiveness of the contract as a whole. Because the parties agree that the contract is currently in full force and effect, ASI's motion to dismiss this portion of JDD's second counterclaim is GRANTED.

### B. Rule 12(b)(6) of the Federal Rules of Civil Procedure

ASI argues that JDD's counterclaims numbers 2 and 4 through 8 should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, enough facts to state a claim for relief that is plausible on its face must be pleaded. In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Bell Atl. v. Twombly, 127 S.Ct. 1955, 1964-65 & 1973 n. 14 (2007)). A claim is plausible on its face when the plaintiff pleads facts from which the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S.Ct. at 1965. The court "must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." In re S. Scrap Material Co., LLC, 541 F.3d 584, 587 (5th Cir. 2008). However, the court need not accept legal conclusions couched as factual allegations as true. Iqbal, 129 S.Ct. at 1949-50.

### 1. JDD's Counterclaims 2 and 4

In its second and fourth counterclaims, JDD seeks declarations that:

> 2. JDD is in full compliance with its obligations under the 2010 Agreement and has not breached that agreement by any action or inaction.

> 4. To the extent JDD has not implemented some or all of the policies and practices ASI refers to as "brand guidelines" in the territories where it sells ANNIE SLOAN® and CHALK PAINT® brand products, such action does not constitute a breach of JDD's obligations under the 2010 Agreement or a justification for ASI to resolve or terminate that agreement.

ASI, citing <u>Welsh v. Navy Fed. Credit Union</u>, 2017 WL 5075930, at *7 (W.D. Tex. June 9, 2017), argues that it is improper to use a declaratory judgment action to adjudicate whether a party breached an existing contract and ask a court to condone a party's past actions. Thus, ASI argues that it is improper for JDD to raise counterclaims 2 and 4 which seek declarations that JDD did not breach the contract.

JDD argues that ASI's contention is not supported by the jurisprudence cited by ASI. In <u>Walsh</u>, 2017 WL 5075930 at *6, the plaintiff raised a breach of contract claim and a declaratory judgment claim seeking a declaration regarding the correct and reasonable interpretation of the contract at issue. The court found that the declaratory judgment claim was redundant and unnecessary because it raised the same issues as the breach of contract claim. <u>Id.</u> The court went on to state that:

> Declaratory judgment is not the appropriate vehicle when the determination of the issue actually asks the court to decide whether the defendant breached the contract. Rather, declaratory judgment is appropriate where it seeks adjudication of the parties' rights and guides their future conduct.

Id. at *7.  JDD points out that ASI did not sue it for breach of contract, but instead is seeking a declaratory judgment that it can opt out of the contract.  JDD's counterclaims 2 and 4 seek declarations that certain actions it may have taken do not constitute grounds for ASI to cancel the contract and direction to guide the parties' future conduct.  Therefore, JDD's counterclaims 2 and 4 raise questions proper for declaratory judgment, and ASI's motion to dismiss is DENIED as to counterclaims 2 and 4, other than the portion of counterclaim 2 that this court found does not state a controversy.

### 2. JDD's Counterclaims 5 though 8

In its fifth through eighth counterclaims, JDD seeks declarations that:

> 5.      JDD has the right per the 2010 Agreement to market, advertise, promote, distribute, and sell ANNIE SLOAN® and CHALK PAINT® products using whatever methods and means deemed appropriate by JDD in its reasonable discretion;

> 6.      JDD has exclusive distribution rights for ANNIE SLOAN® and CHALK PAINT® brand products in North America, the United States, Canada, Central America, South America, Australia, New Zealand, and other parts of Australasia;

> 7.      the 2010 Agreement applies to control the relationship between ASI and JDD in all of those geographical areas where JDD is the exclusive distributor of ANNIE SLOAN® and CHALK PAINT® brand products;

> 8.      JDD has the sole right to select and terminate stockists in its reasonable discretion in those geographical areas where JDD is the exclusive distributor of ANNIE SLOAN® and CHALK PAINT® brand products.

ASI contends that these counterclaims are not plausible because JDD seeks declarations that the 2010 Agreement allows JDD to act in ways that are inconsistent with the terms of the 2010 Agreement.  ASI argues that JDD's fifth through eighth counterclaims fail to state claims because

the 2010 Agreement does not give JDD *carte blanche* to use whatever means it wants to market ASI's products, while disregarding ASI's trademarks and promotional materials; does not permit ASI to expand its territory beyond the United States; and, does not address JDD's alleged right to chose stockists without input from ASI.

JDD argues that ASI's motion should be denied because these counterclaims raise plausible claims for relief. As to counterclaims number 5, JDD argues that it has alleged various instances of ASI's inserting itself into JDD's marketing operations and that it seeks a declaration that "ASI's efforts to dictate details of how JDD conducts its activities managing its distribution network and marketing the products . . . are not authorized by the [2010] Agreement and that JDD therefore is not obliged to follow ASI directive regarding these matters as long as the methods and means employed by JDD are reasonable." JDD argues that ASI's insistence on JDD's using brand guidelines actually interferes with JDD's contractual obligations to use its "best efforts" to market ASI's products.

With respect to counterclaims 6 and 7, JDD argues that ASI's complaint also seeks a declaration regarding JDD's territory. JDD agrees with ASI that the plain terms of the 2010 Agreement state that JDD's territory is the Untied States. However, JDD argues that it has stated claims for relief in counterclaims 6 and 7 because JDD alleges that the 2010 Agreement was modified to expand JDD's territory. JDD argues that counterclaim 8 states a claim for relief because the 2010 Agreement does not permit ASI to encroach on JDD's operations in the manner alleged.

Counterclaims 5 though 8 state claims for relief regarding ASI's actions that are allegedly not authorized by the 2010 Agreement and the alleged modification of the 2010 Agreement. JDD is seeking guidance on the parties' future dealings under the 2010 Agreement, and any alleged

modifications thereof, should the parties not proceed under Article 2024. Therefore, ASI's motion to dismiss JDD's counterclaims 5 though 8 is DENIED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Annie Sloan Interiors, Ltd.'s Motion for Partial Summary Judgment (Doc. #9) is **GRANTED**.

**IT IS FURTHER ORDERED** that Annie Sloan Interiors, Ltd.'s Rule 12(b) Motion for Partial Dismissal of Jolie Design & Decor, Inc.'s Counterclaim (Doc. #14) is **GRANTED**, as to a portion of Jolie Design & Decor, Inc.'s second counterclaim, and it is **DISMISSED**. The motion is otherwise **DENIED**.


New Orleans, Louisiana, this __4th__ day of May, 2018.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**